BARBARA WEISMAN, TRUSTEE *v.* MARY KASPAR ET AL.
(15141)

PETERS, C. J., and CALLAHAN, BORDEN, KATZ and PALMER, Js.

Argued March 16—decision released June 20, 1995

*Joel M. Ellis,* with whom was *Donald E. Weisman,* for the appellant (plaintiff).

*Jerome M. Griner,* for the appellee (substitute defendant).

CALLAHAN, J. This appeal requires that we determine whether the trial court properly concluded that the plaintiff, Barbara Weisman, Trustee (BWT), a mortgage lending partnership, acted fraudulently with respect to a certain mortgage transaction with the named defendant, Mary Kaspar. BWT brought an action against Kaspar seeking to foreclose a mortgage that it held on real estate owned by Kaspar in East Hartford. Kaspar subsequently paid the entire amount allegedly due on the mortgage note, and BWT withdrew its complaint. Thereafter, Kaspar filed a three count substitute counterclaim alleging that BWT had acquired its mortgage interest through a series of fraudulent dealings with Kaspar and that BWT was unjustly enriched by Kaspar's payment. On January 22, 1992, and for several days thereafter, Kaspar's counterclaim[1] was tried to the court, *Burns, J.* The trial court filed a memorandum of decision awarding Kaspar damages in the amount of $298,707.15, plus interest, on her counterclaim. BWT appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We conclude that the evidence adduced at trial does not support the trial court's findings that BWT acted fraudulently with respect to Kaspar, or that BWT was unjustly enriched by Kaspar's payment, and we therefore reverse the judgment of the trial court.

The trial court found the following facts. In 1987, Kaspar owned three parcels of real estate in East Hart-

[1] Kaspar died in October, 1991, and thereafter her son, Francis J. Kaspar, Jr., the executor of her estate, was substituted as a party defendant. We refer herein to Mary Kaspar as Kaspar.

ford. Two of the parcels were two-family residential properties, and the third was used as a commercial rooming house. Kaspar was an elderly widow who had managed the properties on a day-to-day basis until her health began to fail after she suffered a stroke.

In April, 1987, Kaspar realized that she was no longer physically able to oversee the management of the properties, and therefore listed the three parcels for sale with a local real estate agency. On April 14, 1987, Gerald S. Haymond, a real estate broker and investor, submitted a formal purchase offer to Kaspar. Haymond's offer was in part a standard form one page real estate purchase and sale agreement and was in part a four page typewritten addendum, and proposed the following terms of purchase: a total price of $375,000, to be paid to Kaspar by means of a $500 cash deposit upon the parties' execution of the purchase and sale agreement, owner financing of $285,000 extended to Haymond by Kaspar, with such financing to be secured by a purchase money second mortgage given by Haymond to Kaspar, and cash at the closing in the amount of $89,500. The addendum to the purchase offer further provided that Haymond was contemplating certain changes to the existing structure of the properties and that Kaspar would agree to subordinate her purchase money second mortgage to a first mortgage in a principal amount no greater than $200,000. On the advice of her real estate agents, Kaspar rejected this offer.

After further negotiations, on April 29, 1987, Kaspar and Haymond executed a one page purchase and sale agreement wherein Kaspar agreed to sell her three properties to Haymond, or his corporate nominee, for a total purchase price of $400,000. The agreement provided that Kaspar would provide owner financing to the purchaser in the amount of $280,000, and that the remainder of the purchase price was due in cash at the

closing. While the parties were negotiating the terms of an addendum that were to be similar in substance to those terms initially proposed by Haymond, Kaspar retained attorney Philip P. Apter to conduct further bargaining with Haymond on her behalf.

During the period of time between the signing of the purchase and sale agreement and the closing, Haymond approached Jack L. Rosenblit, a principal in BWT,[2] from whom Haymond had obtained financing on prior occasions, and inquired whether BWT would be interested in providing funds for Haymond's purchase of Kaspar's properties. After touring the properties and discussing the terms of the proposed transaction with Haymond, Rosenblit, on behalf of BWT, verbally agreed to provide Haymond with financing in the amount of $200,000 and to take back a first mortgage on the properties bearing a 24 percent interest rate. The trial court found that when Rosenblit agreed to provide Haymond with this financing, Rosenblit was aware that: (1) the rental incomes generated by the properties would not support the interest payments required by the mortgage; (2) no improvements to the properties were contemplated by Haymond; and (3) because BWT's loan was to be for $200,000 and Kaspar's was to be for $280,000, Haymond would be left with approximately $80,000 in cash at the closing. The trial court also found that Rosenblit was aware that Haymond intended to use the excess cash to pay interest on both loans until he could resell the properties for a quick profit.

After speaking with Rosenblit, Haymond suggested to Kaspar that in order for the transaction to proceed, she would be required to subordinate her purchase money mortgage to a $200,000 first mortgage. The trial court also found that Haymond assured Kaspar that

---

[2] BWT consisted only of Rosenblit and Barbara D. Weisman.

the excess cash generated by this financing arrangement would be utilized in making improvements to the properties. The trial court further found, however, that both Haymond and Rosenblit knew that Haymond did not intend to use the excess cash to improve the properties, but intended to use it to pay interest on the BWT loan, while trying to resell the properties as soon as possible.

The closing took place on May 8, 1987. On that day, an addendum to the purchase and sale agreement was prepared by Apter that was similar in form and content to the addendum produced by Haymond and submitted to Kaspar with Haymond's original purchase offer. The addendum, which was signed by both Haymond and Kaspar, contained a clause stating that Kaspar was aware that the buyer was contemplating structural improvements to the properties, and that she would agree to subordinate her $280,000 purchase money mortgage to a mortgage not to exceed $200,000.

Title to Kaspar's properties was transferred to Christopher Claire, Ltd., a corporation that Haymond had formed for the purpose of taking title to the Kaspar property. Contemporaneously with the Kaspar-Christopher Claire, Ltd. closing, the mortgage given by Christopher Claire, Ltd., to BWT to secure BWT's $200,000 loan was closing in another room in the same office. The trial court found that neither Kaspar nor Apter knew that the other closing was taking place. Haymond was represented by attorney Edward N. Lerner with respect to both transactions, and Lerner subsequently recorded both mortgage documents on the East Hartford land records. BWT's mortgage was recorded prior to the Kaspar mortgage.

In September, 1987, Kaspar notified Apter that Christopher Claire, Ltd., had missed a payment on the mortgage. In anticipation of a possible foreclosure

action, Apter reviewed the land records and discovered, for the first time, that the BWT mortgage was recorded prior to the Kaspar mortgage, and that it carried a 24 percent interest rate. When Apter revealed his discovery to Kaspar, she was "flabbergasted."

In April, 1988, Christopher Claire, Ltd., again defaulted, and Apter commenced a foreclosure action on Kaspar's mortgage against Haymond and Christopher Claire, Ltd., listing in the complaint BWT's mortgage as an encumbrance prior in right to Kaspar's mortgage. The foreclosure proceeded and resulted in a judgment of strict foreclosure for Kaspar in October, 1988. Because there was no redemption, title to the East Hartford properties subsequently revested in Kaspar.

BWT commenced the present foreclosure action against Kaspar in March, 1989, and Kaspar subsequently filed her substitute counterclaim. When Kaspar paid over the entire amount demanded as due, BWT gave Kaspar a release of its mortgage interest and withdrew its complaint. Kaspar thereafter sold the properties to a third party for $430,000, and proceeded to trial on her counterclaim.

On the basis of these findings of fact, the trial court concluded that "[i]t is clear that Kaspar has established all of the elements of fraud. . . . Kaspar was induced to sell her property on the false representation by both Haymond and Rosenblit that any additional financing was for improvement at the property, which both knew was untrue and she was forced to pay under duress almost $300,000 to obtain a release of the BWT mortgage. Kaspar has established all of the elements of duress. . . . All of the elements of fraud have been proven by clear and satisfactory evidence." The trial court also concluded that "[i]n the present action . . . the court has found that, to the detriment of Kaspar,

BWT obtained money from Kaspar to which BWT was not entitled. Further, the court has found that BWT was not entitled to receive payment on the mortgage to [Christopher Claire, Ltd.,] because that mortgage was obtained through fraud. The court has found that Haymond induced Kaspar to agree to subordinate her priority purchase money mortgage by stating that he was to use the proceeds to improve the property when both Haymond and Rosenblit knew that the proceeds would be used for part of the purchase price and to make the high monthly interest payments on the BWT mortgage while Haymond attempted to convey the property as quickly as possible. This false statement of fact benefitted BWT in that BWT took a mortgage with an unusually high interest rate upon which Kaspar eventually made payment. The conduct of the parties and the circumstances surrounding the sale of the property, the granting of the mortgages, and the payment on the mortgages clearly establish that BWT has been unjustly enriched. Since BWT was unjustly enriched, the court may order that Weisman pay restitution to Kaspar."[3]

The trial court thereafter dismissed BWT's various special defenses, and awarded damages on the first and third counts of Kaspar's substitute counterclaim[4] in the amount of $298,707.15, which the court concluded was the amount paid by Kaspar under protest and under duress in order to obtain a release of the BWT mort-

[3] Count two of Kaspar's counterclaim alleged that the terms of the BWT mortgage were unconscionable, and sought reformation thereof. The trial court concluded that because Kaspar paid to BWT the amount demanded by BWT for a release of its mortgage, this count was moot. Because of our conclusion that, as a matter of law, Kaspar was under no duress in paying off the mortgage, she cannot seek to revive the issue of the unconscionability of the mortgage. See footnote 15.

[4] Count one of Kaspar's counterclaim alleged fraud, while count three alleged unjust enrichment. The trial court did not specify on which of the two counts it was awarding the damages to Kaspar.

gage, plus interest at 10 percent from the date of payment to the date of judgment. The trial court also awarded punitive damages on the first count of the substitute counterclaim in the amount of $1. This appeal followed.

On appeal, BWT claims that the trial court improperly concluded that: (1) Kaspar had established the necessary elements of an action for fraud; (2) Kaspar's payment of the amount demanded by BWT was made under duress; and (3) BWT had been unjustly enriched by Kaspar's payment.[5] We agree with each of BWT's claims, and we therefore reverse the judgment of the trial court.

I

BWT first claims that the trial court was incorrect when it concluded that Kaspar had sufficiently established the required elements of a cause of action for fraud. We agree with BWT.

The essential elements of an action in common law fraud, as we have repeatedly held, are that: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury. *Billington* v. *Billington*, 220 Conn. 212, 217, 595 A.2d 1377 (1991); *Kilduff*

---

[5] BWT also claims that the trial court improperly awarded complete restitution of the amount paid by Kaspar to BWT to obtain a release of the BWT mortgage, when such a theory of recovery was not sought by Kaspar in her pleadings or at trial; that the trial court improperly denied BWT's special defense that alleged that the $80,000 that Kaspar recovered from Apter's professional malpractice insurance carrier must be applied to reduce her recovery from BWT; and that the trial court improperly calculated Kaspar's damages. Because we conclude that Kaspar did not sufficiently establish the necessary elements of a cause of action for fraud and did not prove that her payment to BWT was made under duress or that BWT was unjustly enriched by such payment, we do not address these claims.

v. *Adams, Inc.*, 219 Conn. 314, 329, 593 A.2d 478 (1991); *Maturo* v. *Gerard*, 196 Conn. 584, 587, 494 A.2d 1199 (1985). The party asserting such a cause of action must prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as "clear and satisfactory" or "clear, precise and unequivocal." *Rego* v. *Connecticut Ins. Placement Facility*, 219 Conn. 339, 343, 593 A.2d 491 (1991); *Kilduff* v. *Adams, Inc.*, supra, 327.

A

BWT contends that the trial court improperly found that Kaspar had satisfied her heightened burden of proof with respect to her claim that Rosenblit[6] had induced her to agree to subordinate her purchase money mortgage to BWT's mortgage by falsely representing that the $80,000 of excess financing that Haymond was to receive at closing would be used to make structural improvements to the properties.[7] Kaspar, on the other hand, argues that the evidence produced at trial clearly indicated that Rosenblit knew of and col-

---

[6] BWT, as a partnership, would be liable to Kaspar for any fraud attributed to Rosenblit while acting in the ordinary course of business of the partnership. See General Statutes § 34-51.

[7] BWT also claims that because the record clearly indicates that Rosenblit had never spoken with Kaspar or Apter and had not participated in the drafting of the purchase and sale agreement, it cannot be found liable for Haymond's alleged fraudulent representations regarding structural improvements, unless Haymond is first determined to have been a partner or agent of BWT. We note, however, that if the evidence sufficiently established that Haymond had committed the fraudulent acts alleged by Kaspar, and if the evidence further established that Rosenblit knew of the fraudulent scheme and wilfully aided in its execution, BWT would be chargeable with having committed actionable fraud, provided all of the elements of the cause of action are proven by clear and satisfactory evidence. See, e.g., *Etgen* v. *Washington County Building & Loan Assn., Inc.*, 184 Md. 412, 418, 41 A.2d 290 (1945); see also *Krajewski* v. *Blair*, 297 A.2d 70, 72 (Del. 1972); *Miller* v. *State Dental Council & Examining Board*, 39 Pa. Commw. 613, 396 A.2d 83, 88 (1979), rev'd on other grounds sub nom. *Snell* v. *State Dental Council & Examining Board*, 490 Pa. 277, 416 A.2d 468 (1980); 37 Am. Jur. 2d 403, Fraud and Deceit §§ 305–310 (1968).

luded in Haymond's misrepresentations regarding the structural changes and the purpose of the excess moneys, and that all of the elements of a cause of action in fraud were proven by clear and satisfactory evidence. We conclude that the evidence produced at trial was insufficient for the trial court to have determined that BWT participated in or even knew of the fraudulent misrepresentations, if any, of Haymond.

We begin with a statement of the proper standard governing our appellate review. "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Kimberly-Clark Corp.* v. *Dubno*, 204 Conn. 137, 153–54, 527 A.2d 679 (1987). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Doyle* v. *Kulesza*, 197 Conn. 101, 105, 495 A.2d 1074 (1985).

Because the trial court's legal conclusion that Kaspar had established all four elements of a cause of action for fraud necessarily depends upon the trial court's findings of fact, we must initially review those factual findings to determine if they find support in the evidence. According to the trial court, when Rosenblit agreed to loan Haymond $200,000 in return for a first mortgage on the properties and a 24 percent interest rate, Rosenblit knew that the rental income from the properties was insufficient to pay the interest required by the loan.[8] The trial court further found that Rosenblit had known that the financing arrangement would leave Haymond with excess cash at the closing, and that the excess cash would be used to pay the required interest on the BWT loan, because Haymond did not have sufficient funds of his own to make the payments. The trial court also found that Haymond had assured Kaspar, in negotiating the subordination clause of the addendum, that any excess financing received by him would be used to improve the properties. Finally, the trial court found that Rosenblit not only had known of Haymond's representations to Kaspar regarding improvements, but also had known that Haymond had not in fact intended to make any such improvements.

The trial court's conclusion that Kaspar had satisfied her burden of proving the existence of the first two elements of fraud, which require that there be a false statement of fact and that the party making the untrue statement know that the statement is indeed untrue, is not warranted by the evidence produced at trial. The evidence simply does not support the trial court's determination that Rosenblit was aware that Haymond did

---

[8] The BWT mortgage contained a term guaranteeing payment of interest for six months. Rosenblit testified that the purpose for requiring a 24 percent interest rate with six months of interest payments guaranteed was to ensure, in an intensely active real estate market, that if Haymond sold the property immediately after he purchased it, BWT would nevertheless make its desired profit on the transaction.

not contemplate making any structural changes or improvements to the properties.

We first note that Haymond testified that he had discussed with Rosenblit the language in the addendum regarding Haymond's contemplation of changes to the existing structure of the properties, and had explained to Rosenblit that the reason that clause had been included in the contract was that Haymond had anticipated removing a kitchen from one of the properties and installing a bedroom, in order to bring the building into compliance with local ordinances.[9] Haymond further testified that other than this brief conversation regarding the potential removal of the kitchen, he had not discussed any other structural changes with Rosenblit. There was no testimony indicating that prior to the closing, Haymond had informed Rosenblit that he no longer contemplated removing the kitchen.[10] Moreover, Lerner, who represented Haymond throughout the negotiations and closing, testified that it was Haymond's intention to "fix the property up a little, change the way it was run," before ultimately reselling the parcels for a profit. Haymond testified that although he did not remove the kitchen as originally planned, he nevertheless had spent approximately $2000 in making minor improvements to the properties, in addition to substantial amounts paid for management, insurance and advertising for new tenants.

Kaspar argues that Rosenblit knew that Haymond's representation regarding the structural changes was

---

[9] Haymond testified that the building was being operated by Kaspar as an "illegal . . . rooming house."

[10] Although Haymond never removed the kitchen as he had anticipated doing, he testified that the reason he did not do so was because the town of East Hartford subsequently indicated that even if the kitchen was removed, it would not issue a license to operate the property as contemplated, because there was inadequate parking available on the premises. Haymond's testimony did not indicate when he made the decision not to remove the kitchen, however, and it likewise did not indicate that he conveyed his decision to Rosenblit.

false, because Rosenblit did not require that an escrow account be maintained for the purpose of preserving the funds necessary to make such changes, as he had done in his prior financing arrangements with Haymond. Although Haymond did testify that with regard to his previous dealings with Rosenblit, if Rosenblit had required that Haymond use a portion of the loan proceeds to improve the properties, an escrow agreement was created in order to maintain the funds to be used for that purpose, Rosenblit testified that he did not require an escrow account in this case because, after viewing Kaspar's properties, he concluded that no renovations were necessary. Moreover, Haymond testified unequivocally that the only discussions regarding contemplated changes to the properties had been initiated by him, not Rosenblit. We conclude that, although the fact that Rosenblit did not require an escrow account in this case in order to reserve a portion of BWT's loan for improvements suggests that Rosenblit did not require Haymond to make structural improvements to the properties, this evidence alone is not sufficient to prove by clear and satisfactory evidence that Rosenblit knew that Haymond did not intend to make the structural changes as he had originally indicated to Rosenblit.

Finally, we note that although there was some testimony indicating that Haymond intended to use a portion of the excess financing to make mortgage interest payments, there was no testimony from any witness indicating that Haymond intended to use the entire $80,000 to make such interest payments or that Haymond did not intend to make any structural changes to the properties. In fact, the testimony from Haymond and Lerner was precisely to the contrary. Thus, we conclude that the evidence produced at trial does not justify the trial court's conclusion that Kaspar had proven, by clear and satisfactory evidence, the first two required ele-

ments of a cause of action in fraud, namely, (1) that Rosenblit made or colluded in a false representation, and (2) that Rosenblit knew that Haymond's representation to Kaspar regarding contemplated improvements to the properties was false.

The trial court's conclusion that Kaspar had satisfied her burden of proving the third element of fraud, which requires that the party making the untrue statement of fact do so with the intent to induce the other party to act in a certain way, was likewise not supported by the evidence produced at trial. Regardless of whether Rosenblit knew that Haymond's representations regarding structural changes were untrue, there was no evidence indicating that Rosenblit knew that Haymond had made any such representations with the intent to induce Kaspar to agree to subordinate her purchase money mortgage to BWT's mortgage.

The trial court, moreover, did not identify any testimony, nor did it make a finding of fact, that Rosenblit was aware that Kaspar would only agree to subordinate her purchase money mortgage to BWT's mortgage if she was first assured that any excess financing received by Haymond would be used for the improvement of the properties. In fact, Rosenblit testified that he had nothing whatever to do with Haymond's negotiations with Kaspar, and that he had never spoken with Lerner, Apter or Kaspar regarding the transaction or anything else. When asked why he did not contact Kaspar or Apter regarding the transaction, Rosenblit testified that to do so would have been pointless, because he was only concerned with the value of the properties and the amount he was going to lend to Haymond; he left it to Haymond to negotiate his own deal with the seller.[11]

[11] Moreover, the testimony regarding Haymond's negotiations with Kaspar does not clearly indicate that Haymond had made any representations regarding improvements with the intent to induce Kaspar to agree to subordinate her mortgage. Haymond testified that in negotiating his pur-

The trial court also could not have concluded from the language of the addendum that Rosenblit knew that Haymond was making the representation regarding contemplated repairs to the properties in order to induce Kaspar to agree to subordinate her purchase money mortgage. Although the relevant clause in the addendum states that "[t]he seller is aware that the purchaser is contemplating certain changes within the existing structure and agree[s] to subordinate the second mortgage," Apter, who had negotiated and drafted the final addendum, testified that his interpretation of the clause was that it did not limit what Haymond could do with any excess cash received at the closing. Moreover, the purchase and sale agreement contained no clause indicating that Kaspar would not agree to subordinate her mortgage if Haymond failed to use any excess financing that he received at closing for the improvement of the properties. Thus, we conclude that the evidence produced at trial was not sufficient for the trial court to have found that Kaspar had clearly and satisfactorily established the third element of fraud, namely, that Rosenblit knew that Haymond had made untrue statements to Kaspar regarding contemplated improvements in order to induce Kaspar to agree to subordinate her purchase money mortgage.

In sum, we conclude that Kaspar failed to present clear and satisfactory evidence sufficient to establish

---

chase offer, he simply made it clear to everyone involved that, because the properties were operating at a negative cash flow, the only way that he would complete the proposed purchase was if he could take money out of the closing to help finance that negative cash flow. Similarly, Apter testified that he had extensively advised Kaspar that the total amount of loans secured by the properties might exceed the purchase price, but that the only way to do business with Haymond was to agree to this financing scheme. Francis Kaspar, who attended all meetings and the closing with his mother, testified that the only representation regarding Haymond making improvements to the properties had been made by Lerner, Haymond's attorney. Further, Francis Kaspar testified that he was not even aware of what improvements were contemplated.

that Rosenblit knew of or participated in any alleged fraudulent representations by Haymond. The trial court's determination that Kaspar had established all of the elements of fraud to support a recovery under this theory, therefore, was improper.

### B

BWT also contends that the evidence produced at trial does not support a finding that Rosenblit had induced Kaspar to agree to subordinate her purchase money mortgage by fraudulently concealing the status, existence and terms of BWT's mortgage. We agree.

Although the testimony adduced at trial clearly indicates that neither Jack Rosenblit nor Mark S. Rosenblit, the attorney representing BWT with respect to the Haymond financing transaction, had disclosed to Kaspar or Apter the terms or existence of the BWT mortgage, the testimony also clearly indicates that neither Jack Rosenblit nor Mark Rosenblit had attempted in any manner to conceal the mortgage from Kaspar or Apter.[12] In fact, the evidence explicitly demonstrates that Apter had ample opportunities both prior to and at the closing to inquire as to the terms of the BWT mortgage and that contrary to the trial court's finding, he was aware at the Kaspar-Christopher Claire, Ltd. closing that the BWT mortgage was closing contemporaneously in another room in the same office.

Lerner testified that on several occasions prior to the closing, he had discussed with Apter the fact that a $200,000 first mortgage was going to be placed upon Kaspar's properties prior in right to Kaspar's purchase money mortgage, but that Apter did not question him

---

[12] Mark Rosenblit testified that when lending money to a buyer for the purchase of property, he never contacted the seller or the seller's attorney, because they were not signing the notes and were not otherwise parties to the transaction.

regarding the terms of that mortgage. Lerner further testified that at the closing itself, although he could not recall Apter having examined the BWT mortgage documents, the existence of the BWT mortgage had been discussed: "I discussed it with [Apter]. . . . I don't remember him reading it. I discussed it with him because it was essential to working out the final terms of the deal. The terms couldn't have been worked out without discussing the details of that with him. [The mortgage deed] was available to him." Lerner also testified that the BWT mortgage documents had been available at the closing, and that neither he nor anyone else had prevented Apter from reviewing them.

Indeed, we note that Lerner's testimony is supported by the testimony of Apter who testified that while Kaspar's purchase money mortgage was closing, Lerner informed him that the closing on the first mortgage was taking place in another room in the same office. Apter further testified that he then imparted this information to Kaspar. Apter testified that despite the fact that Lerner told him that the first mortgage was closing contemporaneously with the Kaspar purchase money mortgage, and despite the fact that Lerner did nothing to prohibit him from examining the first mortgage documents, he did not inquire as to the terms of that first mortgage.[13]

Finally, we note that at the closing, Kaspar and Haymond executed a commercial loan affidavit, which subsequently became an exhibit at trial. Paragraph five of the affidavit stated the following: "The undersigned make(s) this Affidavit for the purpose of inducing the Lender, Barbara Weisman, Trustee, to extend this mortgage loan in the amount of $200,000.00 to the

---

[13] Subsequent to the transactions that are the subject of this appeal, Kaspar instituted an action for professional malpractice against Apter. Apter's malpractice insurance carrier thereafter paid $80,000 to Kaspar in consideration of Kaspar's release of Apter from all further liability.

undersigned well knowing that the Lender will extend this mortgage loan increase only in complete reliance upon the truth and accuracy of the statements contained herein."[14] Apter testified that he had explained to Kaspar all of the documents that Kaspar signed at the closing, including the commercial loan affidavit. Apter further testified that when the commercial loan affidavit was executed at the closing, all parties were aware that BWT was obtaining a first mortgage on Kaspar's properties. Consequently, there is overwhelming evidence that the existence of the BWT mortgage was not concealed.

We conclude that, on the basis of all of the evidence presented at trial, the trial court could not have reasonably determined that Rosenblit colluded with Haymond to fraudulently conceal from Kaspar the status, terms or existence of the BWT mortgage. The evidence clearly demonstrated that Apter and Kaspar were made aware of the existence of the BWT mortgage at the closing and that Apter had the opportunity to review the mortgage documents at that time, but failed to do so. The fact that Rosenblit did not make an effort personally to inform Kaspar of the terms of BWT's loan to Haymond, without more, is insufficient to establish BWT's liability for fraudulent concealment.[15]

---

[14] The substance of the affidavit was contained in paragraph four and provided as follows: "This transaction is a commercial transaction and is not a consumer transaction. The proceeds of this mortgage loan are not being used for personal, family, or household purposes but only for purchase of said property by Christopher Claire, Ltd., for investment. . . ."

[15] The trial court determined that because of the fraudulent conduct of BWT in inducing Kaspar to agree to subordinate her purchase money mortgage, Kaspar was then forced to pay the sum of $298,707.15 under duress to BWT for a release of BWT's mortgage. Because we have concluded that BWT's conduct was not fraudulent with respect to Kaspar, however, BWT's foreclosure action and demand for payment on its mortgage was not an "unlawful act or threat" warranting Kaspar's claim that her payment was involuntary. See 1 Restatement (Second), Contracts §§ 175 and 176 (1981); 2 D. Dobbs, Law of Remedies (2d Ed. 1993) c. 10, § 10.2 (1), p. 635 (to show

## II

BWT also argues that the trial court improperly determined that it was unjustly enriched by Kaspar's payment of $298,707.15 for a release of the BWT mortgage. We agree.

"A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . *Connecticut National Bank* v. *Chapman*, 153 Conn. 393, 399, 216 A.2d 814 [1966]. With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . *Providence Electric Co.* v. *Sutton Place, Inc.*, 161 Conn. 242, 246, 287 A.2d 379 (1971). . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Citations omitted; internal quotation marks omitted.) *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282–83, 649 A.2d 518 (1994).

The trial court concluded, after reviewing the conduct of the parties, that BWT had obtained money from Kaspar to which it was not entitled. The court based its conclusion, however, on its previous determination that Rosenblit had conspired with Haymond to fraudulently induce Kaspar to agree to subordinate her pur-

duress, one must prove [1] a wrongful act or threat [2] that left the victim no reasonable alternative, and [3] to which the victim in fact acceded, and that [4] the resulting transaction was unfair to the victim).

chase money mortgage. Because we have concluded
that the trial court improperly determined that Rosen-
blit or BWT had acted fraudulently with respect to
Kaspar, we conclude that the trial court also improp-
erly determined that BWT had been unjustly enriched
by Kaspar's payment for a release of BWT's mortgage.

## III

Kaspar claims, as an alternate ground for affirmance
of the trial court's judgment, that BWT was not entitled
to the payment of $298,707.15 that it had received from
her for a release of BWT's mortgage because her pur-
chase money mortgage had priority and there had
never been a subordination of that mortgage. More-
over, Kaspar claims BWT was not a third party bene-
ficiary of the purchase and sale agreement between
Haymond and her, wherein it was indicated that there
might be a subordination of Kaspar's mortgage at some
future time. We disagree.[16]

The issue of whether Kaspar's purchase money mort-
gage was subordinated by the language of the addendum
to the Kaspar-Haymond purchase and sale agreement
became irrelevant upon the conclusion of Kaspar's fore-
closure action against Haymond, wherein the trial court
ordered a strict foreclosure. Ordinarily, a judgment of
strict foreclosure in favor of a senior mortgagee vests
absolute title in the foreclosing plaintiff, upon the fail-
ure of the junior mortgagees who are parties defend-
ant to redeem the property. *First Bank* v. *Simpson*,

---

[16] Kaspar also submitted the following alternate grounds for affirmance
of the trial court's judgment: (1) that BWT is liable for conspiring with Hay-
mond to defraud Kaspar; and (2) that Rosenblit is liable as a joint tortfeasor
with Haymond for the fraud of Haymond. Because each of these alternate
grounds for affirmance necessarily depends upon a conclusion that fraudu-
lent conduct may be attributed to Rosenblit, and because we have concluded
that the trial court improperly found that Rosenblit had acted fraudulently
with respect to the Kaspar transaction, we reject both of these alternate
grounds for affirmance.

199 Conn. 368, 373, 507 A.2d 997 (1986). We note, however, that the evidence clearly indicates that in her foreclosure complaint, Kaspar listed the BWT mortgage as an encumbrance prior in right to her purchase money mortgage, and thus did not make BWT a party defendant to her foreclosure action. Because it was not made a party to Kaspar's foreclosure and consequently not given the opportunity to redeem or to force a foreclosure by sale; see id., 374; the judgment of strict foreclosure rendered by the trial court in favor of Kaspar was void as against BWT, regardless of whether BWT was a senior or junior encumbrancer. See R. Kratovil & R. Werner, Modern Mortgage Law and Practice (2d Ed. 1981) § 18.04, p. 239; 2 C. Wiltsie, Mortgage Foreclosure (5th Ed. 1939) § 835, p. 1355. Thus, because BWT's mortgage was not extinguished by Kaspar's foreclosure but continued in existence when Kaspar regained title to her properties, BWT was entitled to Kaspar's payment to obtain a release of its mortgage. We reject, therefore, Kaspar's alternate ground for affirmance.

The judgment of the trial court is reversed and the case is remanded with direction to render judgment for BWT on the defendant's counterclaim.

In this opinion the other justices concurred.