[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs, Gregory and Rachel Sullivan, purchased a twenty-eight (28) unit, 4 story apartment building located at 45 Wheeler Avenue in Bridgeport, Connecticut, from the defendant, Lorenz Mang, on December 28, 1998. The building was approximately 28 years old and had been purchased by the defendant in 1984. The property was originally advertised by Mang on July 5, 1998, and he listed the property without an agent. The listed price was $800,000, but the contract price was $780,000. At the CT Page 9681 time of closing, all units were rented.
The plaintiffs inspected the property on several occasions and were on the premises weekly from August, 1998 through the closing on December 28, 1998. As a part of their mortgage approval, they were required to have a building inspection which was done by the EMG Company at a cost to them of $3,200. The EMG Certification of Property Condition Review was offered as plaintiff's exhibit 4. EMG was originally a defendant in the case, but it is not at this time. No explanation was offered as to their absence from the case.
Subsequent to the closing, the plaintiffs began to experience problems with the premises and after making demands upon Mr. Mang, they instituted this case. The operative complaint in this case at trial was the Amended Complaint of May 12, 2000, and the plaintiffs are only pursuing the defendant on the first four counts of that complaint. In Count One, sounding in Intentional Fraud and in the Second Count sounding in Negligent Misrepresentation, the plaintiffs claim that the defendant knew or should have known of the defective condition of many systems within the building and either falsely advised the plaintiffs about those problems or failed to mention them at all. Many of the specific claims within the complaint have been withdrawn or not pursued, and the court will discuss only those on which evidence was offered. The Third Count repeats everything contained in the two earlier counts and alleges a breach of contract based on a breach of express and implied covenants including the covenant of good faith and fair dealing. The Fourth Count is the catch-all CUTBA claim based on the allegations of the earlier counts.
To this complaint the defendant has filed an Answer and six Special Defenses. He originally also filed a Counterclaim which was withdrawn at trial. The majority of the Special Defenses pertain to contract language essentially stating that the property is being sold in an "as is" condition and without reliance upon any representations of the buyer.
The contract in question (plaintiff's exhibit 3) was executed on August 3, 1998, by the parties. Certain paragraphs of that contract are pertinent and are quoted below. On page 1:
 "FIXTURES: Such of the following items that are now on the property and owned by the Seller are included as part of the purchase price AS IS: All hot water heaters, heating, plumbing, and electrical fixtures and systems, kitchen ranges, refrigerators, washer, dryer, screens CT Page 9682 and screen doors, storm windows and doors, shrubbery and plantings on the property. Plaintiff's exhibit 3, Agreement, p. 1.
On page 2:
 "CONDITION OF PREMISES: The Purchaser agrees that he has examined the premises and is fully satisfied with the physical condition thereof, and that neither the Seller nor any representative of the Seller has made any representation or promise upon which the Purchaser has relied with respect to the condition of any property covered by this sale, except as herein expressly set forth. Purchaser agrees to accept the premises in their present "as is" condition." Plaintiff's exhibit 3, Agreement, p. 2.
On page 1 of Exhibit A to the Agreement:
 "1. SELLER'S COOPERATION; ACCESS: Seller agrees to cooperate with Buyer to facilitate Buyer's acquisition and due diligence investigation of the Property. To this end, Seller agrees to:
 (i) Permit Buyer and Buyer's agents, consultants, engineers, appraisers, inspectors and contractors reasonable access at reasonable times to the Property to complete building studies and reports, appraisals, environmental testing, sampling, surveying, testing, evaluation and the completion of Buyer's due diligence investigations of the Property and to make a final inspection of the Property prior to the closing of title;. . . ." Exhibit A to Plaintiff's exhibit 3, Agreement, p. 1.
On page 3 of Exhibit A to the Agreement:
 "2. REPRESENTATIONS AND CONDITIONS PRECEDENT: The Seller makes the representations which follow. All representations made herein by Seller are made to the best of Seller's information, knowledge and belief, are material and have been relied on by CT Page 9683 Buyer in entering into this transaction, and although, unless otherwise indicated in each case, the same are not intended to constitute warranties or survive closing of title, the existence of a slate of facts fully consistent with each of these representations on the date set forth herein for closing shall be a condition precedent to Buyers obligations to perform hereunder. . . .
 (xii) All personal property and operating systems currently serving the Property are in working order and repair." Exhibit A to Plaintiff's exhibit 3, Agreement, p. .3.
On pages 3 and 4 of Exhibit A to the Agreement:
 "4. DUE DILIGENCE CONTINGENCIES: Buyer'S performance of this Agreement is contingent on Buyer's satisfactory review of all leases and other agreements affecting the property, and Buyer's receipt of satisfactory reports (a "Report the "Reports") with respect to the following inquiries. Buyer will undertake each of these inquiries at Buyer's expense and will diligently complete each such inquiry. The foregoing notwithstanding, Buyer reserves the right to determine, in Buyer's sole discretion, the order of proceeding with each such inquiry, and whether or not to proceed with respect to certain inquiries based on the results of any of the other inquiries. Unsatisfactory findings in any one inquiry shall be sufficient cause to permit Buyer to terminate this Agreement. Each Report being satisfactory to Buyer shall be construed to be a condition precedent to Buyer's obligation to perform this Agreement. If this transaction fails to close, all such reports shall become the property of the Seller at no cost to the Seller." Exhibit A to Plaintiff's exhibit 3, Agreement, p. 3.
 "a. The Reports. (2) Mechanical/Structural. The Buyer shall be able to obtain an acceptable mechanical and building and/or structural assessment(s) of the Property by a consultant of Buyer's choice. Such assessment CT Page 9684 shall include, but not be limited to, heating and air conditioning systems, plumbing, hot water systems, sewage system, electrical system, smoke and fire alarm systems, foundation, basement, roof, chimney, floors and ceilings, and insulation." Exhibit A to Plaintiff's exhibit 3, Agreement, p 4.
 "c. Unsatisfactory Results, Election to Cancel. In the event Buyer is either (i) unsatisfied, in his sole discretion, with the leases and other agreements impacting upon the Property, or (ii) unable, despite diligently pursuing same, to obtain satisfactory Reports prior to August 30, 1998, then Buyer may elect to terminate this Agreement, by providing written notice to Seller to such effect on or prior to August 30, 1998. Upon such election, all sums deposited on account of this Agreement shall immediately be refunded to Buyer. Upon receipt by Buyer of such funds, this Agreement shall be null and void and neither party shall have any rights against the other. If this Agreement is not so terminated by August 30, 1998, then the same shall be in force and effect." Exhibit A to Plaintiff's exhibit 3, Agreement, p. 4.
The plaintiffs' claims now appear to be limited to the following: the intercom system, the elevator, cracks in bricks on the face of the building, thermostats in individual apartments, bowed windows in the apartments on the back of the buildings, and the building roof. The court will deal with these items separately.
The essential elements in a case of common law fraud are: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the CT Page 9685 other party to act upon it; and (4) the other party did so act upon that false representation to his injury." Barbara Weisman, Trustee v. Kaspar,233 Conn. 531, 539, 661 A.2d 530 (1995). Further, "fraud by nondisclosure, which expands on the first three of the four elements, involves the failure to make a full and fair disclosure of known facts connected with a matter about which a party has assumed to speak. . . .", Gelinas v. Gelinas, 10 Conn. App. 167, 173, 522 A.2d 295, cert. den., 204 Conn. 802, 525 A.2d 965 (1987), or has a duty to speak based upon the circumstances. Wedig v. Brinster, 1 Conn. App. 123, 131,469 A.2d 783 (1983), cert. den., 192 Conn. 803, 472 A.2d 1284 (1984). Once a vendor undertakes to speak on a subject, the vendor must then make a full and fair disclosure as to that subject. Franchey v. Hannes,152 Conn. 372, 379, 207 A.2d 268 (1965), Wedig v. Brinster, supra. Fraudulent nondisclosure in a real estate situation is ample grounds for relief under both fraud and CUTPA. Catucci v. Ouelette, 25 Conn. App. 56,592 A.2d 692 (1991). The standard of proof of fraud is higher than mere preponderance of the evidence. It must be clear, precise and unequivocal.Rego v. Connecticut Insurance Placement Facility, 219 Conn. 334, 343.
As far as the intercom system is concerned, the defendant said it was in working order as of the time of closing and the plaintiffs claim that after the closing they learned from various tenants that their system did not in fact work. The systems were initially installed to allow access to the apartments by visitors. Some time after May of 2000 the new owners replaced the system with a new one. They sent a notice and questionnaire to their tenants on May 7, 2000, asking them if their present intercoms worked. Many said no, but that only established that on that day, a year and a half after closing, they did not work. There was no evidence offered that any tenant had put the defendant on notice of a problem with their intercoms as of the time of closing and therefore no evidence of actual or constructive notice of any defect with the system. As to the intercom, the plaintiffs have failed to prove the necessary elements of any of the allegations within the four counts of the complaint.
As far as the elevator was concerned, the defendant stated it was in good working condition and in July of 1998 had been inspected by the state and given a one year license. The defendant also said he had it serviced monthly. He did know of some non essential work that needed to be done which he claims he told the plaintiffs about and which would cost between $2,000 and $3,000. There was no evidence that the elevator was not in working condition at the time of closing. There was also some testimony about a sump pump at the base of the elevator shaft that did not work. On inspection before closing, there was no standing water in the elevator shaft. The plaintiffs had the sump pump repaired in October of 2000. No proof has been offered to prove any of the counts of the complaint as to the elevator or pump. CT Page 9686
The plaintiffs testified that after the closing numerous brick facings fell off the building. All of that was observable to them and their housing inspector before the closing. It was all in plain view. The defendant testified that they discussed it and he advised them that he had material in the basement that he used periodically to correct the problem. He says they were aware of it and he told them it was simply occasioned by the age of the building. Again, as to this problem, the plaintiffs have offered insufficient evidence to prove any counts of their complaint.
As far as the individual thermostats in each apartment, the defendant testified that he had installed a central thermostat in the basement of the building which he set to provide uniform heat to each apartment and he so advised the plaintiff. The individual thermostats were no longer used. The plaintiffs apparently changed the central thermostat system to individual units. That was the plaintiffs' right if they wanted to but they have not presented any evidence to prevail on any of their claims with reference to the heat or individual thermostats.
As far as the windows on the back of the building are concerned, they were observable to the plaintiffs and their inspector prior to the closing. No one made any complaints. The defendant made no representations concerning those windows. He says the windows were fine and not bowed at the time of closing. The plaintiffs presented the testimony of Chris DeFosche of Affordable Glass who, within the last month in June of 2002, inspected the windows and gave the plaintiffs an estimate for replacing 14 windows. He stated he had no idea what their condition was in 1998. Again, the plaintiffs have failed to prove any of the allegations of their complaint with reference to the windows.
The court will spend more time on the subject of the building roof because it consumed most of the trial time. The plaintiffs did replace the roof in the summer of 2000 at a cost to them of $47,242.89. That fact alone would not justify a finding of liability against the defendant. The plaintiffs must prove under their complaint that the defendant made a fraudulent, or negligent misrepresentation upon which they relied concerning it or that they failed to disclose the known defective condition of the roof or that the defendant's statements concerning the roof somehow constituted a breach of contract. Two witnesses testified as to those conversations: the plaintiff Rachel Sullivan and the defendant. There was also reference made to certain questions answered by the defendant about the roof in the EMG Review (plaintiff's exhibit 4). There was also the testimony of William Martin, the owner of Diamond Roofing, who put on the new roof in the summer of 2000. CT Page 9687
Mrs. Sullivan admitted that she and her husband had been on the roof with the defendant on several occasions from August of 1998 until the closing on December 28, 1998. Neither she nor her husband noted anything wrong with it with reference to cracking or leaking, and in fact the defendant had just coated it with some kind of silver preservative. She said the roof looked okay. She claims the defendant said the roof was to his knowledge in good condition, that he had no problems with it and it was not leaking. She further testified that the defendant told her he had replaced the roof some time in 1986.
Mrs. Sullivan further testified that in October of 1999 she had complaints from three tenants as to leaks in the ceilings of their apartments. Thereafter, she testified she observed leaking into the fourth floor apartments. She never indicated which apartments or by whom they were rented. The plaintiffs produced none of the tenants as witnesses. There is no evidence that these leaky conditions existed on December 28, 1998, or that anyone of these tenants had complained of or advised the defendant of the leaks.
The defendant testified as to the condition of the roof and interestingly says almost the same thing as Mrs. Sullivan. He recalls being on the roof with the Sullivans on at least five occasions. He admits telling them that in his opinion the roof was in good condition and that as far as he was concerned it did not leak. No one had complained to him of leaks.
The defendant admits further telling the plaintiffs that he had the roof replaced in 1986 by Al's Roofing and that some years later he noted that a ponding problem had developed in certain limited areas of the roof. He claims he finally had that problem fixed in August of 1994 by Fairfield Construction for $1,330. Their bill, defendant's exhibit A, described the work as follows: (1) painted on asphalt primer, (2) laid roof shingles in low areas to build up new roof, and (3) heat fused 1000 square feet of polyglass modified bitumen. He said that is all the work he did on the roof, and he was unaware of their being three roofs on the building. He further testified that the plaintiff Gregory Sullivan, on one of the occasions they were on the roof together, told him he was going to replace the roof. That evidence was not contradicted. Mr. Sullivan, though present at trial, did not testify in the case. The defendant testified that everything he said about the roof prior to the closing was the truth and he never attempted to mislead the plaintiff.
The plaintiffs also offered into evidence as plaintiffs' exhibit 2 an appraisal report the defendant commissioned in May of 1986 and which he provided to the plaintiffs. Interestingly that appraisal on page three states that the roof had been recently replaced which is consistent with CT Page 9688 the defendant's testimony. The appraised value of the property was shown as $1,200,000.
The plaintiffs also introduced as plaintiffs' exhibit 4 the EMG Certification of Property Condition Review that they ordered and paid for in the amount of $3,200. This was their building inspection which was a condition of their mortgage approval. Several items within the report are significant. In Table 1, entitled "Immediate Repairs" it lists "O." In another section entitled "Property Condition Sight Check List" by Environmental Site Assessor it was observed under the "Comments" section, "No leaks or ponding was observed on roofs." The same report lists the defendant's response as to the condition of the roof as "good", and there were no roof leaks. And finally, EMG in the section entitled "Project at a Glance", described the condition of the roof as "good — fair."
This was the roof evaluation by the plaintiffs' own building inspection team, good to fair. If as a result of that they wanted to further explore the condition of the roof before closing, they could have done so under the contract. They did nothing further about the roof prior to closing.
The plaintiffs did present the testimony of William Martin, the president of Diamond Roofing, whose company replaced the building's roof in the summer of 2000, a year and a half after the plaintiffs acquired title. Mr. Martin stated that when the old roof was removed, there were three roofs on the building which is against code because you cannot put a third roof on top of two existing roofs; you must remove the two existing roofs. He also described poor flashing work by the prior artisans as well as non functioning drains, all of which led to wetness under the roof. The problem with his testimony is that even if the court were to accept his opinion that these conditions existed in 1998, they do not prove that the defendant knew about them and then misrepresented the conditions. Even if there were three roofs on the building, the court cannot conclude that two were done by the defendant when he has testified he only replaced one roof in 1986. What might have taken place with the roof prior to the defendant's acquisition of the property before 1984 is simply unknown.
This claim of the plaintiffs is just like all the others. They had total access to these premises in general for five months before they closed title. They had an extensive premises inspection before the closing where the roof was described as fair to good. The report stated that no leaks or ponding on the roof were observed. They have produced no testimony from any tenant that damage was done to their ceiling units from roof leaks or other roof leaks at any time between August and December of 1998. They produced no testimony that any tenant ever CT Page 9689 complained to the defendant of roof leaks during that time period. Further, there is unrefuted testimony that the plaintiff Gregory Sullivan told the defendant he intended to replace the roof which he in fact did. But he now wants the defendant to pay for it.
It is very easy to claim misrepresentation, whether it be fraudulent, or negligent, but it is much more difficult to prove, and it should be. The plaintiffs purchased the building "as is" in 1998 and since that time and right up to the time of trial they want to upgrade their property at the defendant's expense. They just recently, in June of 2002, got a bid from Affordable Glass to replace 14 windows at the back of the building for $7,896, which contract they have not even let and they want this defendant to pay for it, three and a half years after the sale.
These types of cases are fact driven. There is little quarrel with what the state of the law is. As with the other claims of misrepresentation or non-disclosure, now including the building roof, the court finds that the plaintiffs have failed to prove by the standard of proof required as to each claim of misrepresentation any of the allegations of misrepresentation whether it be fraudulent, or negligent. All the defendant said was in his opinion the roof was good and did not leak prior to the date of closing. The plaintiffs have not proven that that was false or that the defendant had failed to disclose the true condition of the roof. Because of that finding, the plaintiffs have also failed to prove counts 3 and 4 insofar as it relates to the roof.
Judgment will enter for the defendant.
GORMLEY, J.