[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] RULING ON MOTION TO REOPEN
On February 7, 2002, respondent mother Deborah R.[1] filed a pro se motion to reopen the judgment against her in this termination of parental rights case. Petitioner, the Commissioner of the Department of Children and Families, ("DCF"), filed a motion to dismiss and a memorandum of law in support, on March 5, 2002. On March 22, 2002, respondent mother filed a memorandum in opposition to the motion to dismiss. The case was transferred to the Regional Child Protection Session in Middletown on April 25, 2002. The motion to dismiss was denied on June 13, 2002. The Court heard evidence on the motion to reopen on July 16, and August 13, 2002. Movant Deborah R. submitted a post-trial brief on August 28, 2002. For the reasons set forth below, the motion to reopen is denied.
The following background is relevant to the Court's determination. Termination of parental rights petitions were filed September 27, 2000 alleging that mother and father's parental rights to their sons Travis and James should be terminated because the children were found in a prior proceeding to have been neglected or uncared for and the parents had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the children, they could assume a responsible position in the lives of the children. C.G.S. § 17a-112 (B) (1). Trial on the termination of parental rights ("TPR") petition in this case began on September 24, 2001 before the court (Levin, J.). On September 25, 2001, mother consented to termination of her parental rights to Travis and James.[2] The court (Levin, J.) thoroughly canvassed mother on her consent to termination and found that she had entered her consent knowingly and voluntarily with a full understanding of the consequences of her actions. Tr. 9/25/01 at p. 5. The court also found that she was represented by competent counsel. Id. During the course of the canvass, mother was advised that by consenting, she was "giving up all legal rights to and responsibilities for [the children] in the future." Id. at p. 2. Termination orders entered, and DCF began adoption efforts. As of the filing of the motion to reopen, adoption was not final. (See C.G.S. CT Page 15465 § 45a-719).
The motion to reopen alleges that a threat was made by a DCF worker to induce Deborah R. to enter a consent. In her written motion, mother alleges that she was told that if she continued to contest the termination, the two boys would be moved from the home of her brother Anthony D. and his wife, Tammy, and separated. At oral argument on May 28, 2002, counsel for mother also alleged that on the morning the consent was entered, DCF had threatened to remove the mother's newborn, Ryan R., from her care if she did not consent.
Petitioner argues that mother voluntarily consented to termination of her parental rights to Travis and James and was thoroughly canvassed. DCF argues that any discussion surrounding the newborn was initiated by mother and did not consist of a threat to remove Ryan absent mother's consent to termination of her parental rights to Travis and James. Further, petitioner argues that reopening the judgment would not be in the best interest of these two children.
FACTS
The evidence adduced at the hearing on the motion to reopen established the following facts:
Deborah R. has a lengthy history of substance abuse and addiction, and a lengthy criminal history of shoplifting convictions to support her drug habit. The TPR trial was scheduled for June, 2001. Deborah R. learned she was pregnant while incarcerated at York Correctional Institution in Fall, 2000. Due to serious health concerns during the pregnancy, Deborah was seen regularly up to several times a week at Yale New Haven Hospital. Based on a recommendation from Yale, Deborah was released from incarceration to allow continuing treatment without correctional staff having to transport her and accompany her continuously. Due in part to these health issues and because Deborah retained new counsel, the trial was continued to September, 2001. Ryan was born in July, 2001. Although he was healthier than predicted, he continued to require significant care and attention as a result of a kidney malfunction in utero.
Deborah R. was referred to New Directions after participating in a partial hospitalization program for treatment for substance abuse and addiction. Deborah R. began seeing Kathy Keena, a therapist from New Directions outpatient drug and alcohol rehabilitation facility for family therapy in July, 2001 and continued to work with her through March 2002. Ms. Keena credibly testified that they met weekly and that Deborah R. was scrupulous about making all of her appointments, even though she often CT Page 15466 walked to the appointments in hot weather while she was pregnant. Her individual counselor had assigned a diagnosis of cocaine dependence. Because Ms. Keena had concerns about possible depression following the birth of Ryan in July, 2001, she referred Deborah to a psychiatrist. Dr. Offsay evaluated respondent mother and found that she did not have any symptoms of any type of depression, including post-partum depression. Exhibit A.
The trial commenced September 24, 2001 before Judge Levin. On the morning of the second day of trial, Deborah R. consented to termination. There was conflicting testimony about the events of the morning of September 25, 2001. Deborah testified that DCF worker Marcy Wood initiated a conversation with her in the hallway before court, informed her that DCF was applying for a petition against Ryan, Deborah's newborn, and stated that termination would be the easiest way to eliminate that. Also Deborah R. testified that although she had heard that her son James had been molested by a neighbor while in a relative foster placement (with her mother-in-law), she received confirmation of this on the morning of the second day of trial and learned at the same time that James had molested her niece the night before. She testified that she spoke with the children's therapist, Lisa Richardson, who discussed the possibility of consenting with her and who gave Deborah R. her opinion that if Deborah consented, there would be continued contact between Deborah and the boys.
Contrary to Deborah's testimony, DCF worker Marcy Wood testified that Deborah and Jimmy R. approached her in the hallway and inquired about DCF's plans with regard to Ryan. Ms. Wood answered that DCF may very well file a neglect petition with regard to Ryan in view of continuing issues around Deborah's possible continued drug use. DCF was aware of Deborah's shoplifting arrest in September, and knew that, as Deborah herself conceded, she generally shoplifted only to support her drug habit. This raised concerns that Deborah might have relapsed. The court fully credits Ms. Wood's testimony that she did not seek Deborah's consent in exchange for not taking action with regard to Ryan and that she did not offer to withhold action on Ryan if Deborah consented to termination on Travis and James. Although they did discuss Ryan, Deborah was the one who initiated the conversation, and there was no discussion even approaching a threat of removal of Ryan if Deborah did not consent to termination with regard to Travis and James. Despite Deborah R.'s testimony to the contrary, the court credits the testimony of Marcy Wood that Deborah and Jimmy approached her in the hallway and asked her what was going to happen with Ryan.
Respondent mother's mother Jean D. testified that her daughter called her CT Page 15467 a number of times from the courthouse the day the consent was entered. Jean D. described Deborah as hysterical and not sure what to do. According to Jean D., Deborah told her mother that she felt that if she did not sign the papers, she would not see the boys; if she did sign the papers, she would see the boys and it would be "like a family thing." Jean D. testified that she told her daughter that maybe she should let the boys go, because they would be with her brother and she should not let them (DCF) take another child from her, presumably the newborn, Ryan. She acknowledged that Deborah knew she had consented to termination of her parental rights; she just was not sure whether it was the right thing to do.
Similarly, Deborah's father, Michael D., testified that he spoke to Deborah by phone after the consent was entered and he found her to be distressed. He and his wife have been and continue to be supportive of their daughter Deborah. He clearly had difficulty with the limits placed on visitation by DCF and the children's therapist. He understood that DCF wished to bring all the adults in the family together to discuss guidelines for visitation in part due to some of his conduct, but he nevertheless refused to cooperate.
Respondent mother testified that Travis and James' father, Jimmy, told her this was what they had to do if they wanted to see the boys. Jimmy also testified that he thought they had to consent if they wanted to see the boys. Jimmy testified that he did not recall who approached whom in the hallway on the morning of September 25, 2001.
Travis and James have been living with Anthony and Tammy D. since March, 2000. They plan to adopt Travis and James. After the consent entered, Anthony and Tammy continued to allow and facilitate visitation between respondent mother and the boys. Issues quickly arose over visitation, however, and the therapist and DCF arranged a meeting with all the adults in the family including mother and father, maternal grandparents, and Anthony and Tammy, in order to come to an understanding and to set parameters for visitation. Understandably, DCF, the therapist and relative foster parents wanted some guidelines established for the visitation. A letter was presented by DCF which set forth proposed guidelines and rules for visitation. Respondent mother and father refused to participate in even reviewing the proposed rules for visitation. Maternal grandfather was not cooperative and the meeting quickly deteriorated to the point where maternal grandfather walked out, Anthony threatened him, and the meeting ended. Deborah has not visited with the boys since. After visitation ceased, Deborah filed the motion to reopen the termination.
Lisa Richardson also testified concerning her conversation with Deborah and Jimmy R. the morning the consent was entered. She testified credibly CT Page 15468 that, at the request of their lawyer, she discussed with them their relationship with the boys and how it could continue based upon the ongoing relationship they had with the boys. She had been involved in supervising the therapeutic visitation that the boys had with Deborah and Jimmy starting in August, 2001. They discussed the role of Anthony and Tammy and adoption. They discussed the fact that the ongoing relationship was based on appropriate behavior and how the boys were presenting. She testified that although Deborah wanted a guarantee that they could continue their relationship with their Sons, no one could give them that. She further testified that after the consent was accepted in court, she met with them to set up a session with the boys.
Ms. Richardson explained the breakdown in the visiting relationship with the boys that occurred after the consent as related to concerns about getting the family to work together to ensure that the boys felt safe and secure and part of Anthony and Tammy's family. According to Ms. Richardson, the family fighting caused the boys to be confused about settling into Anthony and Tammy's family. She identified ongoing recovery issues and impulsivity on Deborah's part, as well as difficulty in accepting rules and limits on the visitation which Ms. Richardson believed were in the best interest of the boys as they became fully integrated into Anthony and Tammy's family. Unfortunately, the adults in the family were undermining each other in a way that was detrimental to the boys. She did not tell Deborah that the boys would be removed from Anthony and Tammy and separated from each other. She acknowledged that Deborah was upset and tearful, but testified that she explained to Deborah that if she did consent, and acted appropriately, she could continue to have contact with Travis and James which Ms. Richardson believed to be in the best interest of the children. She could not give them a guarantee of future contact and she credibly testified that Deborah and Jimmy were aware that there were no guarantees.
With regard to the family meeting about visitation, Ms. Richardson explained that the purpose of the meeting among family members and DCF was to ensure that the adults did not continue to undermine each other to the detriment of the boys. She testified that the feeling stated by some family members that Anthony and Tammy were stealing the boys from Deborah and Jimmy was not supporting the placement and that all the adults needed to support the placement in order to give the children permission to adapt. Continued friction among the adults created emotional distress for the boys making them feel as if they did not belong. When it became clear at the meeting that the family members could not cooperate to any degree in an effort to agree to new terms for visitation, it was no longer appropriate to continue visitation. CT Page 15469
Unfortunately, this case involves severely strained family relationships. It was clear from Anthony's testimony that he has experienced overwhelming frustration and sadness as a result of the actions of his sister, Deborah. He has been accused of trying to steal his sister's children, when in fact he and his wife had generously agreed to take them into his home and make them part of his family when their mother was not able to care for them.
DISCUSSION
A motion to open even a stipulated judgment may be granted after four months if it was obtained by fraud, duress, accident or mistake. Solomonv. Kaeiser, 22 Conn. App. 424, 427, 577 A.2d 1103 (1990). For a party to demonstrate duress, "it must prove (1) a wrongful act or threat (2) that left the victim no reasonable alternative, and (3) to which the victim in fact acceded, and that (4) the resulting transaction was unfair to the victim." Noble v. White, 66 Conn. App. 54, 59 (2001) (quoting Weisman,Trustee v. Kaspar, 233 Conn. 531, 549-50 n. 15 (1995). "The wrongful conduct at issue could take virtually any form, but must induce a fearful state of mind in the other party, which makes it impossible for [the party] to exercise his own free will." Id., (quoting Zebedeo v. Martin E.Segal Co., 582 F. Sup. 1394, 1417 (D. Conn. 1984). Here, the movant rests on the claim that it was a wrongful act for DCF to speak to Deborah in the hallway during the trial and that it was that wrongful act which caused Deborah's fearful state of mind. As the facts above establish, it was Deborah R., who approached the worker and inquired about Ryan. The answer given by Ms. Wood was not a threat to remove Ryan if Deborah did not consent. The conversation with Lisa Richardson occurred at the request of Deborah's attorney, and also did not constitute wrongful action by DCF. Here, Deborah R. may very well have been in a fearful state of mind. However, that state of mind was the result of the circumstances in which she found herself facing a trial over the termination of her parental rights to two of her children, the outcome of which was uncertain at best. Additionally, the confirmation regarding her son's molestation may have contributed to her emotional state of mind, but was not related to any wrongdoing by DCF. The action of DCF in answering Deborah's inquiry about Ryan did not cause Deborah's fearful state of mind.
Moreover, whether or not Deborah felt, under the circumstances outlined above, as though she had little choice but to enter the consent, she certainly was able to assess the strength of the DCF's ongoing case against her and discuss her decision with the children's therapist. This was a strategic decision which allowed her to preserve the opportunity to continue to have contact with her sons. She made the decision to consent based on input from the therapist, her mother, her attorney and DCF. CT Page 15470
Nothing in the review of the transcript of the consent proceedings suggests that Deborah did not understand the decision she made despite her emotional state. When asked whether any promises or threats were made to obtain her consent, she answered no. The canvass itself is not the end of the inquiry, however. Jenks v. Jenks, 232 Conn. 750 (1995). The evidence at the hearing firmly established that Deborah weighed her options and knew what she was doing at the time she entered her consent. The fact that she was seeking guarantees of further contact with her sons, which Ms. Richardson could not give, further underscores that she understood what she was doing. There simply was no threat that Ryan would be removed if Deborah did not consent and there was no threat that Travis and James would be removed from Anthony and Tammy's care and separated if Deborah did not consent.
Thus, considered in its entirety, the evidence does not support the claim that the consent was obtained as a result of duress. Here, certainly the consent was given at a highly emotional and stressful time in mother's life. Deborah had an extremely difficult decision to make, a decision made more difficult considering that she was caring for a newborn with a serious medical condition at the time. Counsel for Deborah describes the resolution of the trial by consent as a "lopsided bargain presented at a high point of stress. . . ." Aug. 28, 2002 Brief at 10. Even if it was a lopsided bargain which was made at a high point of stress, that does not mean that the consent was not given voluntarily. The circumstances described above do not amount to duress such that the consent should be reopened. The court finds that the movant has not established even to a fair preponderance of the evidence that the consent was obtained as a result of duress.[3]
 In re Charles R., 1993 WL 7528 (Conn. Sup — Juv. Matters) (1993) is instructive with regard to the issues raised here. In In re CharlesR., a biological mother whose parental rights had been terminated based upon her consent filed a petition for a writ of habeas corpus approximately seven months later alleging that her consent was not voluntarily given because of undue influence by a DCYS worker who pressured her to consent. The court, (Goldstein, J.), reached the merits of the petition and found that there was no undue influence to enter a consent to termination of parental rights. The court stated: "[d]iscussion by social workers, therapists, or attorney with the mother reviewing factors which might tend to favor consent is not necessarily undue influence." Here the discussions did not interfere with Deborah's exercise of her free will in consenting to termination. See Jenks v.Jenks, 232 Conn. 750 (1995).
Section 45-719 permits the court to reopen or set aside a judgment CT Page 15471 terminating parental rights pursuant to common law, "provided the court shall consider the best interest of the child."[4] Thus, the court also considers whether it is in the best interest of Travis and James to reopen the consent entered in this case. The court finds that the boys are now 9 and 5 years of age. They have lived with their Aunt and Uncle and two cousins as part of their family for over two and a half years. This family would like to adopt them. The boys are in great need of permanency. It is not in the best interest of these children to delay further the permanency these boys deserve. The best interest analysis weighs strongly in favor of denial of the motion to reopen.
Thus, because the evidence failed to establish that the consent was entered as a result of duress, and for all the reasons set forth above, the motion to reopen is denied.
It is so ordered this 6th day of December, 2002.
JONGBLOED, J.