[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter came to the court on January 27, 1992 and was tried to the court on diverse days in May and August, 1996.
In his complaint the plaintiff, Albert A. Isola, alleges that he formed a joint venture with the defendants, Alan E. MacKenzie and Sally A. Guido, to purchase the stock of the holding company of "Lee Myles Transmissions". He further alleges that the defendants utilized information about this business opportunity which he possessed as non-public information and deprived him of the economic benefits thereof. He seeks a dissolution and winding up of the joint venture; an accounting of the profits and a settlement among the parties; money damages; imposition of a constructive trust over the assets of the joint venture and their proceeds in favor of the plaintiff; punitive and exemplary damages; and other relief in equity as may appertain.
The defendants filed five special defenses. The first alleges that the plaintiff failed to make the monetary contribution required by the joint venture agreement including his one-third share of $875,000 and attorneys' fees of $75,000. The second alleges that Isola fraudulently induced the defendants to enter into a relationship with him to procure their investment. The third alleges that he induced them to enter an illegal relationship to permit him to defraud his creditors. The fourth alleges that he is estopped by his misrepresentations and fraud CT Page 5225 and egregious misconduct from making claims against the defendants by reason of the transactions which grew out of his misrepresentations and misconduct. The fifth alleges that he cannot recover from the defendants because the joint venture was formed prior to the filing of his bankruptcy petition and was an asset of his bankruptcy estate which he failed to disclose on his petition. The defendants further argue that they contributed monies to the joint venture and are defending a lawsuit in the amount of $100,000; therefore, any relief accorded the plaintiff should be set-off against the one-third contribution he should have made to the joint venture.
In addition, the defendants filed a counterclaim in two counts alleging damages due to the fraud and misrepresentation of the plaintiff and due to a violation of the Connecticut General Statutes § 42-110 (b)(a) (hereinafter "CUTPA"). The defendants seek the following relief by their answer: dismissal of the complaint together with costs and disbursements of the action; by their counterclaim, confirmation of the dissolution and winding up of the joint venture; and an accounting for the income and receipts by the plaintiff and his related entities while the joint venture existed, and since its dissolution for monies and receipts wrongfully diverted; money damages; punitive and exemplary damages and attorneys' fees.
The case was tried to the court on the issue of liability alone with the agreement of the parties that the issue of damages would be tried after the court made a determination as to liability.
From the credible testimony the court finds the facts which follow. In late 1989 Isola sought to purchase the stock of LM Holding Corporation (hereinafter "LMHC"), the holding company for Lee Myles Transmissions franchise. LMHC was a wholly-owned subsidiary of AP Industries, Inc. Isola owned and operated a Lee Myles franchise through his corporation, Intransco, located at 147 White Street, Danbury. With two other individuals, Leon St. Jean and Raymond Keller, neither of whom were connected to his business, he formed AFN Holding Corporation and met with officers of the holding company LMHC. The three men learned that the price for Lee Myles was between $3 million and $4 million and that a good faith deposit of $60,000 would be required for due diligence. They were unable to pursue the purchase because they wanted to finance the purchase with $3 million in bank loans and $1 million from outside investors. CT Page 5226 Therefore, they did not contact Lee Myles again. However, Isola contacted Robert Barsily of Barsily International for the purpose of finding outside investors and both St. Jean and Keller contributed to Barsily's fee.
Barsily turned the matter over to Frederick Randall, a business broker or finder who was not a member of Barsily's company. Barsily and Randall were to divide fees received in connection with this endeavor. Randall initially met with Isola in early 1990. At that time Randall learned nothing about Isola's financial condition but understood Isola to be a successful franchisee who owned three franchises in Connecticut, a building housing the Danbury franchise, and a Corvette which Randall "took to mean some influence." (Testimony of Randall, May 30, 1996, p. 79.) Randall knew of the earlier unsuccessful offer to purchase Lee Myles. He knew that the two other men had been involved in the project and wanted to help Isola but that neither was a source of funding. He was unaware that St. Jean and Keller expected to receive equity interests in the purchasing corporation. He did not know the name "AFN". Therefore, he did not discuss with the defendants the roles St. Jean or Keller might play and at no time did he claim to represent them as well as Isola.
Randall learned through a friend that Sally Guido was interested in purchasing a company. He contacted her and discussed some companies for sale among which was LMHC. He explained that AP Industries was in financial straits and had filed for bankruptcy.
Guido advised Randall that she had a partner, Alan MacKenzie. Guido and MacKenzie knew nothing about the transmission business but had experience in corporate management. She had worked in the field of business development doing "turn arounds for industries." (Testimony of Guido, June 12, 1996, p. 69.) She and MacKenzie had formed MGT, Inc. for the express purpose of acquiring a company they could operate. To that end they called investment bankers and business brokerage firms and sent for information according to the criteria they had developed and they received information on different types of companies.
As a result of his discussion with Guido, Randall contacted MacKenzie and provided him with information about three opportunities, one of which was the Lee Myles one. Randall met with CT Page 5227 MacKenzie on February 21, 1990 and explained that Isola wanted financial partners. MacKenzie indicated that he and Guido would bring management expertise as well as money to the enterprise. He further indicated he had connections to outside sources of financing.
On February 27 MacKenzie, Randall, Isola and Guido met at MacKenzie's offices in Westport. The outcome of this meeting was a decision to visit the White Street franchise location, to get to know each other and to work together to purchase Lee Myles. After the visit to White Street on February 28, the parties decided to contact Alvarez Marsala for information. Alvarez and Marsala was the crisis management firm retained by AP Industries as a consultant. The firm was in charge of handling the sale of LHMC.
From the initial meetings, the parties agreed that they would move forward as three equal partners. They would contribute equally to out-of-pocket expenses and to that portion of the purchase price which would not be raised through outside financing. They anticipated that their equal individual contributions would range from $25,000 to $150,000 depending upon the outside financing they were able to arrange. Isola spoke of using his building as a corporate headquarters and training center and of contributing his expertise with regard to the transmission business. When financing was sought, Isola attended meetings with bank officers as the buyer with successful franchisee experience. Together with Randall, MacKenzie worked on the securing of financing and in putting together and analyzing the packet of financial information sent by Alvarez and Marsala so as to prepare a bid.
The parties also agreed as to their duties and functions in Lee Myles once they purchased it. Isola was to be the Executive Vice-President of Operations, working on a daily basis with the franchisees to improve efficiency and profitability, to teach them to follow corporate policies and procedures and to train them. Guido was to be President and MacKenzie the CEO.
While the defendants and Randall proceeded to seek financing and prepare the bid for Alvarez and Marsala, the plaintiff filed for personal bankruptcy on March 14, 1990 and filed a petition on behalf of his corporation Intransco, Ltd., d/b/a Lee Myles Transmissions on May 10, 1990. He did not inform either Randall, his agent, or the defendants of these CT Page 5228 actions.
On the personal bankruptcy form he filed with his wife Valerie, Isola listed his total assets as $2,004,300 and his total liabilities as $1,737,181.56. (Defendants' Exhibit 15.) Among creditors were the IRS in the amount of $38,400 for income taxes for 1989 and the Connecticut Department of Revenue Services in the amount of $4,100 for sales taxes due for 1988-1989. On the bankruptcy petition which he signed as President of Intransco, he listed the corporate assets as $1,507,200 and liabilities as $1,039,042.43. (Defendants' Exhibit 18.) Among creditors were the IRS for 1987 income taxes in the amount of $71,899 and the state Department of Revenue Services in the amount of $4,100 for sales taxes due for 1988-1989. Also listed was a mortgage on the White Street property for $959,321.43. The market value of the property was listed as $1,450,000.
Furthermore, shortly before his personal bankruptcy filing, Isola received a letter from Lee Myles Associates Corp. advising him that he was 33 weeks behind in submission of weekly business reports and franchise fees. (Defendants' Exhibit 12.) Intransco and he personally owed in excess of $20,000. (Defendants' Exhibit 17, paragraph 13 IIc(ii) and Franchise Continuation Agreement.) On March 15, 1990 he was advised he was in default of a promissory note dated July 12, 1989 for a total of $23,528.88 in principal and interest. (Defendants' Exhibit 13.) These debts were not itemized on either bankruptcy petition. None of this debt was made known to Randall or the defendants.
Meanwhile, the parties continued to take steps toward their purchase of Lee Myles. In July they made an offer to AP Industries to purchase the stock of LMHC. The defendants suggested retaining the law firm of Craig and Ells to represent them and the plaintiff had no objection.
On or about July 12, 1990 Randall contacted Isola to prepare a personal financial statement for Alvarez and Marsala. The purpose of the statement was to show the financial position and strength of the three bidders. Randall spoke to Isola by telephone and took down the information Isola gave him.
Isola told Randall he had assets that totalled $1,228,600. These assets were as follows: CT Page 5229
Cash on hand 12,000
U.S. Govt. and marketable securities 5,600
Non-marketable securities 6,000
Restricted or controlled stock 5,000
Real Estate 645,000
Loans Receivable 34,000
Autos and other personal property 47,000
Life Insurance, cash value 4,000
Other assets: jewelry and silver 100,000
Furnishings and electronics 70,000
Intransco, Ltd. 300,000
Further, he told Randall he had a total of $551,000 in liabilities as follows:
Notes payable to banks 90,000
Credit cards and charges 14,000
Real Estate Mortgages Payable 429,000
Auto Loans 18,000
Isola's net worth was listed as $677,600. Isola did not inform Randall of his debts to Lee Myles. Randall did not confirm any of the information Isola provided him but sent the form to Alvarez and Marsala.
On August 15, 1990 the parties confirmed the terms of an agreement in principle among themselves individually and AP Industries as set forth in a letter from AP Industries. (Plaintiff's Exhibit N). They signed a joint venture agreement on August 21, 1990 in which they agreed in writing to share an equal ownership interest in the corporation formed to purchase the LMHC stock. (Plaintiff's Exhibit F.) They also agreed to CT Page 5230 share equally in all expenses incurred in acquiring LMHC and to agree upon the equity interests in the corporation to be sold to outside investors.
Their bid accepted, the parties were permitted to do due diligence in August. The parties knew that when due diligence occurred, they were to deposit $60,000 in an escrow fund to evidence their good faith in pursuing the purchase. This was the same condition Isola knew of from his earlier contact with LMHC. This amount was to be credited to the purchase price in the event the sale to them was consummated. Each party understood that he or she was to contribute $20,000 to this escrow amount. Shortly before August 15, 1990 Isola indicated that he was unable to raise this amount of money. Randall was surprised because he did not think $20,000 a great deal of money for one engaged in pursuing the multimillion dollar purchase of a corporation. Isola borrowed the money from Sally Guido who had to cash in an IRA in order to lend Isola the money. Isola was aggrieved when she asked him to sign a promissory note with collateral to secure the loan. (Plaintiff's Exhibit O.) The terms of the note were that 60 days from August 15, the date of the note, he would repay $20,000 at 11.5% interest. Isola further agreed that the obligation was "his personally and that of his business, Intransco, jointly and severally." He gave Guido shares in his corporation, Intransco, as security. He did not inform Guide or Randall that both he and the corporation were in bankruptcy.
Due diligence occurred. The due diligence team was comprised of Isola, Guido, MacKenzie, a representative of Craig and Ells and an accountant, Gabe Kwaley. When due diligence was completed, the parties decided to purchase the corporation. As plans for the stock purchase progressed, efforts continued to secure financing. MacKenzie and Randall negotiated with Bank Leumi, to which AP Industries owed in excess of $2 million, to pay off a portion of the loan and roll over the balance, subject to the approval of the bankruptcy court. In addition, MacKenzie worked with Brendan Sachtjen of First American Bank to secure financing. On or about August 15, 1990 the parties signed a letter agreement to purchase the outstanding shares of LM Holding Corporation. (Plaintiff's Exhibit N.)
On September 26, 1990 LM Management Corp. was incorporated by one Jacqueline N. Casper. (Plaintiff's Exhibit JJ.) On September 27, 1990 she adopted by-laws and elected Guido and CT Page 5231 MacKenzie to serve as directors of the corporation until the first annual meeting of shareholders. (Plaintiff's Exhibit KK.) On September 28, 1990 Guido and MacKenzie participated in the first meeting of the board of directors. (Plaintiff's Exhibit LL.) Also present were A. Douglas P. Craig and Theodore F. Ells of Craig Ells. Guido acted as chairman and Ells as secretary. Guido was elected chairman and president of the corporation, MacKenzie, treasurer, Ells, Secretary and Craig, assistant secretary. Items of business transacted included the ratification by the board of the acts of the incorporator and of the banking arrangement with Bank Leumi. Furthermore, the board of directors authorized the issuance of 100 shares of capital stock to each of Guido and MacKenzie. The meeting, for which a waiver of notice was executed, occurred at the offices of Craig and Ells. Isola had no notice of the meeting, nor that LM Management was formed and that a board of directors had been elected and shares issued.
While these actions appear inconsistent with paragraphs 2 and 3 of the joint venture agreement signed by the parties, Isola was represented by Craig and Ells at this time and their actions are imputed to Isola. Allen v. Nissley, 184 Conn. 539,440 A.2d 231 (1981). There is no credible evidence that in taking these actions the defendants intended to eliminate Isola from the joint venture.
On October 1, 1990 Sally Guido as President of LM Management Corp., Buyer, executed a Stock Purchase Agreement with AP Industries as Seller. (Plaintiff's Exhibit G.) Paragraph 10.6 reiterated the essential terms of section 1 of the August 15, 1990 letter of intent which was addressed to Isola as well as the defendants. The paragraph further incorporated the schedules and exhibits which included the Escrow Agreement to which Isola was individually a party and listed as a buyer. Exhibit "B" to the Stock Purchase Agreement lists Isola as one of the Buyer's or LM Management's shareholders. Isola was aware before October 1, 1990 that the stock purchase agreement was to be signed.
On or about October 5 Guido reminded Isola of the approaching due date for payment of the note. Isola indicated he was unable to repay the $20,000. When he spoke with Randall by telephone with regard to his inability to pay, Randall advised Isola to file for personal bankruptcy. At that time Isola told him that he had already done so. Randall was surprised but did CT Page 5232 not tell the defendants of this fact.
On October 26, 1990 Randall received a subpoena from the FBI requiring he produce documents related to Isola. These documents were as follows: "[A]ny and all financial statements of Albert Isola, Albert and Valerie Isola, Isola Associates, and Intransco any and all biographical information on Albert Isola including resumes, narratives, references and any information obtained from references." (Defendants' Exhibit 5.) Randall did not inform the defendants of this development either.
On or about November 5, 1990, Guido received a telephone call from Brendan Sachtjen of First American Bank which caused her and MacKenzie to visit his offices within a day or two. It was at this time that they first learned of the bankruptcy filings and the FBI investigation. First American would not provide financing as requested unless Isola withdrew from the transaction. (Plaintiff's Exhibit U.) The closing for the shares of AP Industries was to occur before December 31, 1990. (Plaintiff's Exhibit R.) The defendants consulted with Craig and Ells. The defendants asked Isola to withdraw from the joint venture on November 6. (Plaintiff's Exhibit U.) Receiving no response, they dissolved the joint venture on November 8. (Plaintiff's Exhibit W.) They scrambled to finance the purchase using personal realty and other assets as collateral. The closing of the stock purchase occurred on December 19, 1990. The stock was purchased by LM Management Corp. of which Guido and MacKenzie were the sole shareholders.
Subsequently, Isola was convicted of bank fraud pursuant to Title 18 U.S.C. § 1344 (a)(2) in connection with the 1989 mortgage loan from Citytrust for the White Street building. Further, facts will be set forth as needed.
The court finds that Isola made material misrepresentations to the defendants. A misrepresentation is an assertion that is not in accord with the facts. Restatement (Second), Contracts § 159. A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so. Id., § 162(2).
The court finds that Isola provided false information to the defendants throughout their relationship. First, he did not report to Randall, his agent, that he had two partners, St. Jean CT Page 5233 and Keller who expected equity interests in the corporation although they could contribute no capital to the purchase. He did not inform Randall that he was not a successful franchisee and owed the franchisor a substantial sum of money for franchise fees, Randall, by not verifying Isola's financial worth or performance as a franchisee, succumbed to Isola's misrepresentations and reiterated them to the defendants.
In fact, Isola was not an owner of three franchises or a successful franchisee. The Waterbury franchise opened in late 1989 and closed in early 1990 and was never in operation. Isola did not own the Bridgeport franchise in January 1990. When he took Guido to see it, they viewed it from an area across the street. It is not clear to the court why Guido was not suspicious of having to view the Bridgeport franchise from a distance. Her suspicions may have been mistaken by seeing Isola use business cards which bore the Bridgeport address.
Isola was not a successful franchisee in early 1990. He failed to inform the defendants that in July 1989 he had signed a note on behalf of Intransco to LM Industries in the amount of $25,000 for unpaid franchise fees owed the franchisor from the beginning of 1989. He had also failed to submit business reports to the head office beginning in mid-1989. On April 9, 1990 when he promised to pay Lee Myles certain sums on or before April 27, 1990, he used stationery of International Transmissions, Inc., located at 510 Boston Avenue, in Bridgeport although he no longer had an interest in the franchise. (Defendants' Exhibit 14.)
When Isola offered to sell the White Street property to the new corporation as a corporate headquarters and training center or to sell it and contribute the capital toward the purchase of the stock, he did not tell the defendants that he had obtained the mortgage on the property with fraudulent information, that the property was under foreclosure, and subject to the jurisdiction of the bankruptcy court. He did not reveal that the purchaser named in the contract for sale of the White Street property was his wife's cousin.
He did not inform the defendants that he and his wife had filed for personal bankruptcy in March 1990. He did not ascribe a value on his bankruptcy schedule to his sole interest in Intransco, Ltd. On the joint bankruptcy petition he stated he had no cash on hand but told Randall on July 12, 1990 that he CT Page 5234 had $12,000. On the joint petition, he valued wearing apparel and personal possessions at $8,000 but told Randall on July 12, 1990 that he, individually, owned $100,000 worth of jewelry. By his own admission he obtained no additional assets between March 14, 1990, the date of the personal bankruptcy filing, and July 12, 1990. He never told Guido at the time he borrowed the $20,000 that he was in default on the Citytrust loan, the franchise agreement, the Lee Myles loan and that he owed the IRS $38,400 as shown on his bankruptcy petition.
In fact, he did not advise the franchisor that Intransco had filed for bankruptcy. (Testimony of Sartori, August 30, 1996, p. 38.) As a result, there was no notice to that effect to be found during due diligence in the corporate records. Further, for purposes of due diligence, the franchisees and franchise agreements were listed numerically without reference to names or shop numbers. (Testimony of Sartori, August 30, 1996, p. 41.) The defendants and the other members of the due diligence team would not have been aware of Isola's financial problems, his failure to submit summaries and his failure to pay franchise fees.
The court also finds that Isola's claim that he was to pay for expenses, the balance due on the promissory note and other fees from his salary from the new corporation is belied by the fact that there is no written memorial of that intent in the joint venture agreement upon which Isola relies.
The essential elements of fraud are "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making the statement; (3) it was made to induce the other party to act upon it; and (4) the other party did act upon it to his injury." Barbara Weisman, Trusteev. Kaspar, 233 Conn. 531, 539, 661 A.2d 530 (1995). The party asserting fraud must "prove the existence of the first three of these elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as `clear and satisfactory' or `clear, precise and unequivocal.'" Id., 540.
The defendants have proven by clear and convincing evidence that the plaintiff made fraudulent misrepresentations upon which the defendants relied.
"Fraud vitiates all contracts, written or verbal and sealed CT Page 5235 or unsealed." Pacelli Bros. Transportation. Inc. v. Pacelli,189 Conn. 401, 409, 456 A.2d 325 (1983). "Proof of fraud in the inducement to contract allows the defrauded party various remedies including rescission. . . ." Hackett v. New Britain,2 Conn. App. 225, 228, 477 A.2d 148, cert. denied, 194 Conn. 805
(1984). Fraud in the inducement to enter a contract is an equitable defense. Connecticut National Bank v. Voog,233 Conn. 352, 367, 659 A.2d 172 (1995). Cf. Texaco v. Golart,206 Conn. 454, 459, 538 A.2d 1017 (1988) (defense of fraudulent inducement may be equitable or legal). Rescission as a defense should be specially pleaded. Mainolfi v. Brazee, 135 Conn. 435, 437,65 A.2d 261 (1949). Where the issue has been raised, however, and the opposing party has not "raised any question that the pleadings were insufficient to afford a basis for a judgment that the agreement had been rescinded," the defect of failing to plead rescission is waived. Id.
Here, while the defendants have not expressly pleaded rescission, they have raised the issue of rescission in their pleadings and testimony. In their answer, the defendants admit that the joint venture agreement was entered into by the parties but contend that the "joint venture was terminated for cause by letter of November 8, 1990." (Defendants' Answer, p. 2, ¶ 7.) The first special defense alleges that the plaintiff, in addition to making false statements of fact, failed to contribute the necessary money to the joint venture. The second special defense alleges fraudulent inducement to enter the joint venture agreement by the plaintiff. The defendants have also counterclaimed for fraudulent misrepresentation, based on some of the same fraudulent misrepresentations that would support rescission.
In addition, Guido testified that she had considered the joint venture agreement with the plaintiff to be null and void "[w]hen we found out it was based upon fraud and deception." (Testimony of Guido, June 13, 1996, p. 76, lines 9-12.) She further testified that she had considered the agreement to be rescinded as of the day of writing the letter which informed the plaintiff that the agreement was terminated. (Testimony of Guido, June 13, 1996, pp. 76-77.) Thus, the defendants have raised the issue of rescission.
The plaintiff has not argued that rescission cannot be considered because of the insufficiency of the pleadings. As a result, the requirement that the defense of rescission be CT Page 5236 specially pleaded is deemed waived. The plaintiff acknowledges that, while the defendants do not appear to have specifically claimed rescission in their special defenses, the defendants do "allude" to such a position in their claims for relief. (Plaintiff's Reply Brief, p. 27.) Furthermore, the plaintiff cannot plausibly argue that the issue of rescission has not been raised when he himself has addressed the issue.
In his trial brief, the plaintiff states, "When the defendants directed [the letter asking the plaintiff to withdraw] to Mr. Isola, they thereby `revoked' or `rescinded' their agreements with him because, according to Ms. Guido's testimony, they were induced by fraud and were, therefore, null and void." (Plaintiff's Trial Brief on Liability, p. 10.) The plaintiff also argues that although the defendants attempted to rescind the joint venture agreement, they actually ratified the agreement. (Plaintiff's Reply Brief, pp. 10-11.) Because the plaintiff was not only on notice as to the defense of rescission but also stated that the joint venture agreement was rescinded by the defendants' letter, the court is not precluded from considering rescission.
"Rescission, simply stated, is the unmaking of a contract." (Internal quotation marks omitted.) Metcalfe v. Talarski,213 Conn. 145, 153, 567 A.2d 1148 (1989). "As a matter of common law, a party to a contract. . . may rescind that contract and avoid liability thereunder if that party's consent to the contract was procured either by the other party's fraudulent misrepresentations, or by the other party's nonfraudulent material misrepresentations." Monroe v. Great American Ins.Co., 234 Conn. 182, 188, 661 A.2d 581 (1995). "The remedy of rescission does not need to be expressly stated in an agreement."Silliman Co. v. S. Ippolito Sons, Inc.,1 Conn. App. 72, 76, 467 A.2d 1249, cert. denied, 192 Conn. 801 (1983).
The Connecticut Supreme Court has "regularly held that it is a condition of rescission and restitution that [the party seeking rescission] offer, as nearly as possible, to place the other party in the same situation that existed prior to the execution of the contract." (Internal quotation marks omitted.)Burt's Spirit Shop. Inc. v. Ridgway, 215 Conn. 355, 360,576 A.2d 1267 (1990). See also Metcalfe v. Talarski, supra,213 Conn. 145; Dukas v. Middletown, 192 Conn. 191, 197, 472 A.2d 1
(1984); Kavarco v. T.J.E., Inc., 2 Conn. App. 294, 299, CT Page 5237478 A.2d 257 (1984). "The very idea of rescinding a contract implies that what has been parted with shall be restored on both sides, and hence the general rule, which is to be reasonably applied . . . is that a party who wishes to rescind a contract must place the opposite party in status quo." (Internal quotation marks omitted.) Metcalfe v. Talarski, supra, 213 Conn. 153.
The defendants notified the plaintiff that the joint venture agreement was terminated "for cause." The defendants' letter stated, "Effective immediately we hereby terminate for cause all ongoing business relationships we have with you including, but not limited to, the Joint Venture Agreement, dated August 21, 1990." (Plaintiff's Exhibit W.) The reasons listed by the defendants for dissolving the joint venture included the plaintiff's failure to inform the defendants of his personal and corporate bankruptcy as well as the federal investigation of his bank loan for the Danbury property. The letter also refers to the plaintiff's signing of the note to Guido secured by collateral in a bankrupt corporation. Finally, the letter addresses the plaintiff's refusal to withdraw from the joint venture in order to facilitate lending arrangements. (Plaintiff's Exhibit W.) Thus, the defendants renounced the contract.
As mentioned above, the plaintiff insists that although the defendants purported to rescind the joint venture agreement, "they ratified their agreements by accepting the benefits of the transaction." (Plaintiff's Reply Brief, p. 31.) "Ratification is defined as the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account. . . . Ratification requires acceptance of the results of the act with an intent to ratify, and with full knowledge ofall the material circumstances." (Citations omitted; internal quotation marks omitted.) Russell v. Dean Witter Reynolds,Inc., 200 Conn. 172, 185, 510 A.2d 972 (1986).
The defendants have not ratified the joint venture agreement. It is true that the defendants went forward with the purchase of the LMHC stock. It does not follow, however, that these acts ratified the joint venture agreement. It is not as though the defendants claimed to rescind and then accepted the plaintiff's financial and other contributions under the agreement. Rather, they renounced the agreement and removed themselves and their acquisition of Lee Myles from any association with the plaintiff. Furthermore, it is clear that the CT Page 5238 defendants had no intent to ratify the agreement, as shown by the letter of revocation and the testimony of Guido.
The defendants did not offer to restore the plaintiff's contributions to him. "Th[e] rule requiring restoration is, of course, inapplicable if the rescinding party has received nothing, and the same is held to be true if he has received nothing of value." (Internal quotation marks omitted.)Metcalfe v. Talarski, supra, 213 Conn. 154. Because the defendants received nothing of value from the plaintiff, there was no need for an offer of restoration.
As discussed above, the plaintiff had nothing of value to bring to the joint venture. The plaintiff claims that he contributed $20,000 toward the due diligence fee. The plaintiff, who was in personal bankruptcy, had borrowed the money from Guido by providing worthless collateral and had defaulted on the promissory note prior to the defendants' renunciation of the agreement. Thus, the plaintiff's "contribution's was worthless, eliminating the need for the defendants to make an offer of restoration.
The plaintiff argues that the defendants did not restore, or offer to restore, the business opportunity of acquiring Lee Myles to the plaintiff, as required for rescission. There was no misappropriation of a business opportunity here. The defendants were not informed that the opportunity brought to them by Randall was confidential. The plaintiff's claim is based on the fact that he was a Lee Myles franchisee and the defendants did not know that the company was for sale. The plaintiff alleges that the AFN Holding Corp. business plan for the acquisition of Lee Myles which represents the work product or agreement of Isola, St. Jean and Keller was entrusted to the defendants as confidential. (Plaintiff's Exhibit H.) Randall did not consider St. Jean and Keller part of the Isola-MacKenzie-Guido group. He did not represent to the defendants that they were still viable participants. The defendants knew only that there had been a previous attempt on Isola's part to purchase Lee Myles but did not know that equity interests in their corporation with Isola were to include St. Jean and Keller.[1] What they saw marked confidential was a business plan that was not operative because the individuals had not been able to find financing. Isola gave Randall several copies to give to others as Randall sought financing for Isola through March 1990. Since Randall, as Isola's agent, did not know the nature of the CT Page 5239 relationship among Isola, St. Jean and Keller, he did not represent that the opportunity was confidential. Therefore, to suggest that the Isola-Keller-St. Jean agreement was confidential is misleading. In addition, it appears that the opportunity could have been discovered both from the bankruptcy records and from Alvarez and Marsala. Because the plaintiff did not have an exclusive interest in acquiring Lee Myles, there was no business opportunity which the defendants were required to offer to restore.
It can be argued that the plaintiff contributed his time and expertise to the joint venture project. In fact, the plaintiff claimed that he devoted much of his time to the project. (Testimony of Isola, August 29, 1996, p. 76.) Even if this kind of contribution were the type which a rescinding party must offer to restore, the plaintiff's contribution was without value. Rather than bringing the expertise that he promised, all the plaintiff brought to the joint venture was experience in running a failed franchise, personal and corporate bankruptcy, and a federal investigation of his financial dealings. The plaintiff not only brought nothing of value to the joint venture, he devalued the defendants' reputations by his duplicity and misdeeds. The ability of the defendants to procure financing for the acquisition of Lee Myles was adversely affected by their association with the plaintiff. If anyone, it is the plaintiff, not the defendants, who should bear the burden of restoring the parties to the status quo.
"[T]he effect of a rescission is to extinguish the contract and to annihilate it so effectively that in contemplation of law it has never had any existence, even for the purpose of being broken." (Internal quotation marks omitted.) Metcalfe v.Talarski, supra, 213 Conn. 159. As a result, the plaintiff's prayer for relief with regard to dissolution and winding up the joint venture, accounting, and other relief based on the defendants' breach of the joint agreement is denied.[2]
Because rescission of a contract renders it void, there can be no recovery for breach of contract. Metcalfe v. Talarski,
supra, 213 Conn. 159. According to the Connecticut Supreme Court, "[a] definite election to rescind a contract is final and operates as a waiver of any claim for damages for any breach of the contract. . . and that [h]e who elects to rescind a contract can claim nothing under it." (Internal quotation marks omitted.) Id. Thus, where a party seeks both damages and CT Page 5240 rescission, rescission ordinarily precludes damages.
"There are instances. . . where the evidence is such that both remedies are available. If, for example, repudiation of the contract requires that restitution for sums paid prior to rescission are the direct consequence of the fraudulent act of which the plaintiff complains, damages are also recoverable."Kavarco v. T.J.E., Inc., supra, 2 Conn. App. 298 n. 4. See alsoGaritta v. David McDermott Chevrolet, Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 028535 (April 17, 1991) ("While rescission and recovery of damages are mutually exclusive remedies in some cases, there are some situations where consequential damages can be granted incidental to rescission.").
The defendants have brought two counterclaims against the plaintiff. The first alleges fraudulent misrepresentation and the second alleges a violation of CUTPA.
The first counterclaim is based on the theory that the plaintiff breached his fiduciary duty as a member of the joint venture. (Defendants' Trial Brief, pp. 10-11.) As a result, the counterclaim must fail because the rescission of the contract renders it void. Because the joint venture agreement is considered void from its inception; 17 C.J.S. § 167; the plaintiff is not liable for a breach of his fiduciary duty as a joint venturer.
With regard to the second counterclaim, the defendants cannot recover under CUTPA. Although this counterclaim is not based on the plaintiff's breach of the joint venture agreement, the defendants have not shown that the plaintiff violated CUTPA.
General Statutes § 42-110b provides that "[N]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."
"In order to allege a CUTPA violation properly, the plaintiff must allege, inter alia, that the acts complained of were performed in a trade or business." Pergament v. Green,32 Conn. App. 644, 655, 630 A.2d 615 (1993). Here, the defendants have neither alleged nor proven that the plaintiff was acting in the course of a trade or business.
It is clear that the plaintiff engaged in deceptive acts or CT Page 5241 practices but it was not in the conduct of his own business of repairing auto transmissions. The basis for the parties' relationship was the purchase of shares of stock in Lee Myles. The plaintiff was not engaged in the trade of purchasing and selling shares of stock. He did not make any misrepresentations as to the financial condition of Lee Myles. Therefore, the plaintiff did not violate CUTPA.
Because the joint venture agreement is considered void ab initio, there can be no recovery for the plaintiff under the theories that rely on the joint venture agreement. The other theories are equally unavailing for the reasons set forth below.
The first theory is breach of a stock subscription agreement. The plaintiff claims that the parties "each entered into subscription agreements for equal shares of the corporation's stock, giving, in return, their consent to relinquish their individual preincorporation rights in the opportunity." (Plaintiff's Trial Brief, p. 37.) The joint venture agreement provides that each party shall have equal ownership interest in the corporation acquiring Lee Myles. The plaintiff argues that because the defendants established a corporation without issuing him shares, the defendants breached the agreement. The plaintiff further argues that, as a result, he is entitled to an equal share of stock and profits of the current corporation.
The defendants argue that the initial corporation was established as a shell corporation and that the shares would have been equally divided among the joint venturers once other equity interests were determined. As discussed above, the court finds that the defendants did not intend to eliminate the plaintiff at the time the corporation was formed. Thus, there was no breach of any agreement regarding stock issuance at that time. If the defendants had failed to issue shares to the plaintiff after acquiring the stock of LMHC, then breach would be an issue. Here, however, when the defendants acquired the stock of LMHC, the joint venture agreement had already been rescinded, thus eliminating any rights the plaintiff had in the shares of the corporation.
Moreover, because the joint venture agreement was rescinded, it is considered void ab initio. 17 C.J.S. 940-41 Contracts § 167 (1963) ("Where the defrauded party elects to consider the contract void, the contract must be considered void from its CT Page 5242 inception."). Therefore, there is no recovery for a breach of the joint venture agreement regarding the stock division.[3]
The second theory of recovery is an accounting/winding up of the joint venture. Since the joint venture has been rescinded and is considered void, there is clearly no recovery here. Similarly, the eight and ninth grounds for recovery regarding dissolution of the joint venture or partnership are eliminated by the rescission of the agreement.
The third theory of recovery is conversion and fraud. This theory is based on the defendants appropriating the joint venture's "property," i.e. the right to purchase the LMHC stock. As discussed above, this court finds that there was no business opportunity held by the plaintiff with regard to the acquisition of Lee Myles. The joint venture, consequently, did not obtain this business opportunity. The defendants therefore cannot be held liable for fraud and conversion based on misappropriation of the business opportunity. The plaintiff's fourth and tenth theories of recovery — misappropriation of joint venture opportunity, misappropriation of ideas — are similarly unavailing.
The plaintiff's fifth theory is breach of the corporate promoters' contract. The plaintiff has not proved that any such contract existed. The plaintiff claims that when the defendant Guido formed the corporation, the fiduciary duty of corporate promoters was breached. Assuming arguendo that the defendants were corporate promoters acting pursuant to an agreement with the plaintiff, there is still no breach. The court finds that the formation of the corporation was not undertaken with the intent to eliminate the plaintiff. The court further finds that there was no breach of the stock subscription agreement. The defendants' acts prior to rescinding the contract did not breach their fiduciary duties as promoters, if any such duties existed. Furthermore, the rescission of the joint venture agreement eliminated the plaintiff's interest in the corporation. Given the rescission of the agreement, the plaintiff had no relationship with the defendants such that he was harmed by the alleged self-dealing of the defendants as promoters.
The plaintiff's sixth theory of recovery is based on breach of fiduciary duty. The plaintiff alleges that the defendants were fiduciaries in several capacities. The first, as joint venturers, is unavailing because the joint venture was rescinded. CT Page 5243 The second, as corporate promoters, is also unavailing, as discussed supra with regard to the fifth theory of recovery.
The third fiduciary duty alleged by the plaintiff is "as confidants." It is not clear what relationship the plaintiff is attempting to rely on here. The issue of fiduciary duty of "confidants" has not been briefed and is deemed abandoned.[4]Commission on Human Rights and Opportunities v. Love Maclean,Inc., 238 Conn. 337, 344 n. 11, 680 A.2d 1261 (1996) ("Where an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived.");Cummings v. Twin Tool Manufacturing Co., 40 Conn. App. 36, 45,668 A.2d 1346 (1996) ("Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned.").
The plaintiff also alleges a fiduciary duty of the defendants as majority shareholders, officers/directors, and trustees. Ordinarily, such a duty runs to shareholders and to the corporation. Cf. Katz Corp. v. T.H. Canty Co.,168 Conn. 201, 207, 362 A.2d 975 (1975). In order for the plaintiff to recover for a breach of fiduciary duty under any of these theories, he must be a stockholder, have a right to the shares or have some other relationship which creates a fiduciary duty owing from the defendants to the plaintiff. The plaintiff, however, lost any rights to stock in the corporation when the defendants rescinded all agreements with the plaintiff due to his fraud. The plaintiff has not shown any other relationship giving rise to a duty toward him on the part of the defendants. Thus, the plaintiff cannot recover under this theory.
The eleventh theory put forward by the plaintiff is interference with the plaintiff's attorney/client contract. The twelfth theory of recovery is interference with the plaintiff's contract rights under the letter of intent/escrow agreement. Because these issues have not been adequately briefed, they are deemed abandoned. Commission on Human Rights and Opportunitiesv. Love Maclean, Inc., supra, 238 Conn. 344 n. 11; Cummings v.Twin Tool Manufacturing Co., supra, 40 Conn. App. 45.
Finally, the plaintiff contends that the defendants misappropriated the plaintiff's share of the escrow deposit. As discussed above, the plaintiff's share of the escrow deposit, $20,000, was borrowed from Guido. The plaintiff obtained the CT Page 5244 loan by pledging stock in a bankrupt corporation as security and failing to inform Guido of his personal bankruptcy. The plaintiff has defaulted on the note. Any recovery for the escrow deposit will be offset by Guido's claim for damages under the note as well as the defendants' other claims for setoff. Because damages have not yet been addressed, this court will not make a determination regarding the escrow deposit and setoff at this time.
The plaintiff has briefed other theories of recovery, in addition to the thirteen listed in his brief of January 21, 1997. The plaintiff also argues that he should recover under the theory of unjust enrichment. This theory, however, has not been adequately briefed. Commission on Human Rights andOpportunities v. Love Maclean, Inc., supra, 238 Conn. 344
n. 11. Furthermore, unjust enrichment is an equitable remedy, inappropriate where the plaintiff has unclean hands as is the case here. See, e.g., Bauer v. Waste Management of Connecticut,Inc., 239 Conn. 515, 525, 686 A.2d 481 (1996) ("where a plaintiff seeks equitable relief, he must show that his conduct has been fair, equitable and honest as to the particular controversy in issue"); Barbara Weisman, Trustee v. Kaspar,233 Conn. 531, 550, 661 A.2d 530 (1995) ("right of recovery under the doctrine of unjust enrichment is essentially equitable").
Finally, the plaintiff argues that the defendants violated their duty of corporate care. This argument simply restates the plaintiff's sixth theory of recovery based on a breach of fiduciary duty in the defendants' capacities relating to the corporation. For the reasons discussed above, the plaintiff cannot recover based on this theory.
For the foregoing reasons, judgment shall enter for the defendants on the issue of liability. Judgment shall enter for the plaintiff on the first and second counterclaims.
SANDRA VILARDI LEHENY, J.